IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

No. 09-55698

SANTIAGO LOPEZ,

      Plaintiff-Appellant,

vs.

PACIFIC MARITIME ASSOCIATION,

      Defendant-Appellee.

On Appeal from the United States District Court
Central District of California
Case No. CV 06-4154-GW(JTLx), The Honorable George H. Wu

MOTION FOR LEAVE TO FILE AMICUS BRIEF AND AMICUS BRIEF
IN SUPPORT OF PLAINTIFF'S PETITION FOR REHEARING OR REHEARING EN BANC

Claudia Center
The Legal Aid Society – Employment Law Center
180 Montgomery Street, Suite 600
San Francisco, CA 94104
(415) 864-8848

Peter Blanck
University Professor & Chairman, Burton Blatt Institute
Syracuse University, 900 Crouse Avenue
Syracuse, New York 13244-2130
(315) 443-9703

Counsel for *Amici* American Association of People with Disabilities, American
Diabetes Association, Association on Higher Education and Disability, Disability
Independence Group, Disability Rights Advocates, Disability Rights Education
and Defense Fund, Inc., Disability Rights Legal Center, Drug Policy Alliance,
Epilepsy Foundation of America, John A. Lancaster, Judge David L. Bazelon
Center for Mental Health Law, Legal Aid Society – Employment Law Center,
National Disability Rights Network, National Employment Lawyers Association
(NELA), National Federation of the Blind, National Health Law Program, New
York Branch of the International Dyslexia Association, and Swords to Plowshares:
Veterans Rights Organization

# TABLE OF CONTENTS

Motion for Leave to File Amicus Brief ....................................................................v

Amicus Curiae Brief ..........................................................................................1

Introduction ......................................................................................................1

Procedural Background ....................................................................................3

Basis For Rehearing And Rehearing En Banc ..................................................5

Legal Argument ................................................................................................6

I.    A Claim Brought Under 42 U.S.C. § 12112(b)(6) Does Not Require a Statistical Showing of Collective Impact, or Other Comparative Evidence Showing That A Group of Disabled Persons Are Similarly Adversely Affected – Evidence Demonstrating That An Individual Has Been Screened Out Is Sufficient. ....................................................................6

    A.    The Plain Language of the ADA Supports Plaintiff Lopez. .............7

    B.    The Legislative History of the ADA Supports Plaintiff Lopez. ........7

    C.    Administrative Authorities Support Plaintiff Lopez. .......................8

    D.    Prior Ninth Circuit Authorities Support Plaintiff Lopez. ................10

    E.    The Divided Panel in Lopez Erred By Referencing and Importing the Statistical Showing Often Presented in Title VII Cases. ...........11

II.    The ADA Requires Close Scrutiny of Employer Policies and Practices that Penalize and Exclude Rehabilitated Drug Addicts. ...........................12

Conclusion. ......................................................................................................15

Appendix – Statements of Interest ...................................................... A-1

# TABLE OF AUTHORITIES

**Federal Cases.**

*Alexander v. Choate,* 469 U.S. 287 (1985) ............................................................1

*Bates v. U.P.S.,*
511 F.3d 974 (9th Cir. 2007) (en banc) ..................................................2, 6, 11

*Bates v. U.P.S.,*
2004 WL 2370633 (N.D. Cal. Oct. 21, 2004) ...............................................11

*Bragdon v. Abbott,*
524 U.S. 624 (1998) ..................................................................................9

*Coleman v. Schwarzenegger,*
2009 WL 2430820 (Aug. 4, 2009) .................................................................2

*Cripe v. City of San Jose,*
261 F.3d 877 (9th Cir. 2001) .......................................................................10

*Echazabal v. Chevron,*
336 F.3d 1023 (9th Cir. 2003) ....................................................................10

*Gonzalez v. City of New Braunfels,*
176 F.3d 834 (5th Cir. 1999) ........................................................................6

*Griggs v. Duke Power Co.,*
401 U.S. 424 (1971) ..................................................................................12

*Hazelwood Sch. Dist. v. United States,*
433 U.S. 299 (1977) ........................................................................4, 11, 12

*Hazen Paper Co. v. Biggins,*
507 U.S. 604 (1993) ............................................................................3, 14

*Hernandez v. Raytheon,*
362 F.3d 564 (9th Cir. 2004) .................................................................2, 12

*Lopez v. Pacific Maritime Association,*
__ F.3d __, 2011 WL 711884 (9th Cir. March 2, 2011) ......................*passim*

*Lopez v. Pacific Maritime Association,*
No. CV 06-4154-GW(JTLx),
Statement Of Decision
on Motions for Summary Judgment
(C.D. Cal. Apr. 3, 2009) ...............................................................................4

*McWright v. Alexander,*
982 F.2d 222 (7th Cir. 1992) ......................................................................14

*Morton v. U.P.S.,*
272 F.3d 1249, 1257 (9th Cir. 2001),
overruled by *Bates v. U.P.S.,*
511 F.3d 974 (2007) ..................................................................................11

*Plata v. Schwarzenegger,*
    2009 WL 2430820 (Aug. 4, 2009) ............................................................2

*Raytheon v. Hernandez*
    540 U.S. 44 (2003) ..........................................................................6

*Robinson v. Excel Corp.,*
    154 F.3d 685 (7th Cir. 1998) ....................................................2, 10

*Rohr v. Salt River Project*
    *Agricultural Improvement & Power Dist.,*
    555 F.3d 850 (9th Cir. 2009) ..........................................................10

*Sch. Bd. of Nassau County, Fla. v. Arline,*
    480 U.S. 273 (1987) ................................................................9, 13, 14

*Stutts v. Freeman*, 694 F.2d 666 (11th Cir. 1983) ................................2, 8

**Federal Statutes.**

42 U.S. C. § 12101(a)(5) ..............................................................................6

42 U.S.C. § 12201(a) ..................................................................................9

42 U.S.C. § 12112(a) ..................................................................................5

42 U.S.C. § 12112(b)(3)(A) ........................................................................6

42 U.S.C. § 12112(b)(6) ......................................................................*passim*

42 U.S.C. § 12113 ................................................................................6, 14

42 U.S.C. § 12114 ........................................................................12, 14, 15

Americans with Disabilities Act of 1990 ..........................................*passim*

Title VII of the Civil Rights Act of 1964 ..............................1, 5, 9, 11, 12

Age Discrimination in Employment Act ..................................1, 5, 14

**Regulations and Administrative Authorities.**

29 C.F.R. § 1630.2(q) ..................................................................................7

45 C.F.R. § 84.13(a)(2) ..............................................................................9

45 C.F.R. section 84, App. A ......................................................................9

EEOC, Technical Assistance Manual
    on the Employment Provisions (Title I) of
    the Americans with Disability Act (1992) ..........................2, 4, 7, 9

## **Legislative History**.

House Comm. on Educ. & Labor, H.R. Rep. No. 485(II),
101st Cong., 2d Sess. (1990) ......................................................6, 8

Senate Comm. on Labor & Human Resources, S. Rep. No. 116,
101st Cong., 1st Sess. (1989) ............................................6, 7, 8

136 Cong. Rec. H2443-H2444 (May 17, 1990)
(Statement of Rep. Rangel) ..........................................................13

135 Cong. Rec. S 10775 (Sept. 7, 1989)
(Statement of Sen. Kennedy) .......................................................13

Letter of Harold Russell, Chairman of
the President's Committee on Employment of the Handicapped,
to The Honorable Tom Harkin (June 7, 1989) ..............................8

## **Rules**.

Federal Rule of Appellate Procedure 29 .........................................v

Fed. R. App. Proc., Rule 35 ............................................................5

Fed. R. App. Proc., Rule 40 ............................................................5

Ninth Circuit Rules of Appellate Procedure,
Rule 29-1 ........................................................................................v

## **Other Authorities**.

Lindemann & Grossman,
Employment Discrimination Law (4th ed.2007) ...........................5

2004 State of the Union Address of George W. Bush
to Joint Session of Congress (Jan. 20, 2004) .................................3

Employers Group, Employment of Ex-Offenders:
A Survey of Employers' Policies and Practices (Apr. 12, 2002) .................15

## MOTION FOR LEAVE TO FILE
## *AMICUS CURIAE* BRIEF

*Amici* are organizations, and an individual, that advise and represent individuals with disabilities, and share a commitment to advancing and protecting the civil rights of persons with disabilities. As such, the *amici* bring a unique understanding of the purpose and role of the Americans with Disabilities Act (ADA) and its implementing regulations in ensuring that all persons with disabilities receive equal employment opportunities. Statements of interests are provided in the Appendix to the brief submitted. *Amici* respectfully move this Court for leave to file the brief submitted herewith, as *amici curiae* in support of the petition for rehearing and suggestion for rehearing en banc. Fed. Rule of App. Proc., Rule 29; Ninth Circuit Rule 29-1.

Because this case poses questions of great importance, amicus participation is particularly appropriate. The ADA imposes a framework for employment selection procedures designed to ensure that individuals with disabilities are not excluded from job opportunities – unless they are actually unable to perform the job. Millions of American workers with disabilities depend upon the statute's careful balancing of antidiscrimination norms and workplace safety interests to ensure continuing equal employment opportunities.

Respectfully submitted,

Claudia Center                                   Peter Blanck
The Legal Aid Society –                   University Professor & Chairman
Employment Law Center                 Burton Blatt Institute
                                                            Syracuse University

Counsel for *Amici* American Association of People with Disabilities, American Diabetes Association, Association on Higher Education and Disability, Disability Independence Group, Disability Rights Advocates, Disability Rights Education and Defense Fund, Inc., Disability Rights Legal Center, Drug Policy Alliance, Epilepsy Foundation of America, John A. Lancaster, Judge David L. Bazelon Center for Mental Health Law, Legal Aid Society – Employment Law Center, National Disability Rights Network, National Employment Lawyers Association, National Federation of the Blind, National Health Law Program, New York Branch of the International Dyslexia Association, and Swords to Plowshares: Veterans Rights Organization

## INTRODUCTION

In enacting the Americans with Disabilities Act of 1990, Congress considered and responded to a vast legislative record documenting discrimination against persons with disabilities gathered through an extensive fact-finding process including thirteen Congressional hearings, special task force hearings held in every state and attended by more than 30,000 citizens, and a review of 40 years of federal lawmaking regarding disability. The resulting law, designed to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," was deliberately drafted to respond to identified problems faced by persons with disabilities. Provisions include: (1) a prohibition upon unnecessary eligibility criteria that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities"; and (2) explicit protections for individuals recovered or in recovery from drug addiction or alcoholism, balanced with terms permitting employers to take particular steps to guard against the negative effects of drugs and alcohol in the workplace.

The divided panel opinion dismissing Santiago Lopez's case in *Lopez v. Pacific Maritime Association* failed to recognize and apply the ADA's distinct statutory provisions, and instead imposed inapposite concepts developed by agencies and courts construing Title VII and the Age Discrimination in Employment Act (ADEA) – two differently worded statutes addressing employment discrimination on the basis of race, sex, national origin, religion, and age. But because disability discrimination operates in ways that are both similar to and different from other forms of discrimination such as race and age discrimination, Congress intentionally selected provisions that diverge from, as well as provisions that track, the language of Title VII and the ADEA.

In failing to respect these choices, the Ninth Circuit opinion in *Lopez* creates impossible barriers to relief for ADA plaintiffs facing common scenarios of

disability discrimination.  Under the panel's analysis, the following persons with disabilities lack the full protections intended by Congress:

> An Iraq war veteran with traumatic brain injury (TBI) facing a pen-and-paper entrance examination (similar to the plaintiff in *Stutts v. Freeman*, 694 F.2d 666 (11th Cir. 1983));
>
> A person with hearing loss facing a hearing test (similar to the plaintiffs in *Bates v. U.P.S.*, 511 F.3d 974 (9th Cir. 2007) (en banc));
>
> An individual with blindness due to macular degeneration, or an individual with epilepsy, excluded from employment based on the requirement that an applicant possess a driver's license (similar to the first example given by the EEOC on page IV-4 of its Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disability Act (1992));
>
> A Vietnam-era veteran who is a long recovered drug addict who is excluded from employment based on a prior positive drug test, or a prior drug possession charge (similar to Mr. Lopez in this case or to the plaintiff in *Hernandez v. Raytheon*, 362 F.3d 564 (9th Cir. 2004)); and
>
> A person with physical injuries such as spinal cord injury (SCI) or amputations who is screened out from a job opportunity by inaccessible computer technology such as a computer mouse (similar to the second example on page IV-4 of the Technical Assistance Manual), or by an unnecessary physical agility test (similar to the plaintiffs in *Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998)).

As detailed herein, weakening and eliminating protections for such individuals is contrary to Congressional intent and plain language of the ADA.  The *Lopez* opinion cannot withstand scrutiny, and must be corrected and reversed.

The protections of the ADA called into question by the *Lopez* opinion are critical at this time in our Nation's history, given the wars abroad and at home. Thousands of veterans are returning home from Afghanistan and Iraq with TBIs, hearing loss, SCIs, post-traumatic stress disorder, related drug and alcohol problems, and other disabilities.  At the same time, states like California are grappling with the unconstitutional overcrowding of their prison systems, *see Coleman v. Schwarzenegger* and *Plata v. Schwarzenegger*, 2009 WL 2430820 (Aug. 4, 2009), and continue to release nonviolent offenders, among whom are Vietnam-era and Gulf War veterans and many with disabilities including histories of drug addiction.  The reintegration of these populations into society is a critical

civil rights and public health objective. *See* George W. Bush, State of the Union (Jan. 20, 2004) ("We know from long experience that if released inmates can't find work or a home, they are much more likely to commit crime and return to prison. … America is the land of second chance, and when the gates of the prison open, the path ahead should lead to a better life.") (proposing re-entry initiative to expand job training and placement services). Rehearing is required.

## PROCEDURAL BACKGROUND

Plaintiff Santiago Lopez seeks to be a longshoreman. Defendant Pacific Maritime Association (PMA) is the employer representative for all of the stevedore companies, shipping lines and terminal operators that employ thousands of longshore workers along the west coast, and enforces hiring policies. One policy is that any applicant who screens positive for drug or alcohol use during the application phase is disqualified permanently from future employment.

Mr. Lopez applied to be a longshoreman in 1997 while addicted to drugs and alcohol. He was excluded based upon a positive result on the drug test. Thereafter, Mr. Lopez became clean and sober. He reapplied to PMA in 2004. However, he was summarily excluded based on the "one-strike" policy, a lifetime ban on employment imposed on anyone who has tested positive on a prior PMA drug test. His efforts to rescind the exclusion, including submission of information to the PMA documenting his successful rehabilitation from drug addiction, were unavailing.

The Court of Appeals ruled the one-strike policy did not constitute "intentional" discrimination against persons recovered from drug addiction because by its terms it eliminates all persons who previously tested positive, not just those with histories of drug addiction. *Lopez*, __ F.3d __, 2011 WL 711884 (9th Cir. March 2, 2011), at *2 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)). The Court found unpersuasive the argument that the employer's stated rationale for adopting the rule – persons testing positive despite advanced notice of a drug test were "irresponsible" and

likely to endanger themselves and others – was discriminatory in that it reflected indifference and stereotypes regarding drug addiction and recovery from addiction. *Id.* at \*2. The policy included no effective process for rehabilitated drug addicts to self identify as persons with disabilities, and the Court disregarded Mr. Lopez's efforts to inform PMA of his status. *Id.*.

The Court then ruled that the one-strike policy did not violate 42 U.S.C. § 12112(b)(6), holding that a (b)(6) claim requires Mr. Lopez to submit the same statistical showing as is required in a pattern and practice race discrimination case:

> To create a genuine issue of fact, Plaintiff must have produced evidence from which a fact-finder reasonable could conclude that the one-strike rule results in fewer recovered drug addicts in Defendant's employ, as compared to the number of qualified recovered addicts in the relevant labor market. … If the number of recovered addicts in Defendant's workforce roughly reflects the number of recovered addicts in the relevant labor market, then Defendant has not broken the law under Plaintiff's theory.

*Id.* at \*\*3-4 (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977)).[1]

In dissent, Judge Harry Pregerson quoted Lindemann & Grossman, Employment Discrimination Law (4th ed.2007), which in turn quoted § 4.3 of the EEOC's Technical Assistance Manual, for the principle that "[i]t is not necessary to make statistical comparisons between a group of people with disabilities and people who are not disabled to show that a person with a disability is screened out by a selection standard." *Id.* at \*5. With respect to the particular facts before him, he argued that "it is manifestly unreasonable to require statistical data regarding the number of recovering addicts either hired by an employer or screened out by the test.

---

[1] In the case below, counsel for Santiago Lopez repeatedly argued that his claims under the FEHA and the ADA could be made without statistical evidence; the district court disagreed. Thereafter, counsel endeavored to provide such statistics. *See Lopez*, No. CV 06-4154-GW(JTLx), Statement Of Decision, at 19-24 (Apr. 3, 2009) (discussing and rejecting plaintiff's argument that statistics are not required, and rejecting "the numbers which he eventually raises"). However, the statistics demanded by the court below and the divided panel – statistics regarding rehabilitated drug addicts in the population versus employed by the PMA – do not exist. Moreover, even if such statistics did exist, they are unrelated to an individual "screen out" claim. Whether or not PMA employs other rehabilitated addicts does not alter the fact that Mr. Lopez was screened out by the one-strike policy because of his disability.

These figures are not kept by employers, and indeed such data likely could not be lawfully acquired. Moreover, recovering addicts are unlikely to identify themselves to employers, or to a plaintiff's investigator in a lawsuit such as this, even if asked." *Id.*

## BASIS FOR REHEARING AND REHEARING EN BANC

Rehearing is appropriate where the panel has overlooked or misapprehended points of law or fact. Fed. R. App. Proc., Rule 40. Rehearing en banc is appropriate where necessary to "secure or maintain uniformity of the court's decisions" or where "the proceeding involves a question of exceptional importance." Fed. R. App. Proc., Rule 35. Here, the divided panel's opinion must be reversed because it conflicts with numerous precedents of this Circuit. In prior cases, this Court has made clear that statistical evidence is not required for challenges to discriminatory qualification standards or selection criteria under 42 U.S.C. § 12112(b)(6). The panel's decision flatly contradicts those precedents, mis-citing authority construing Title VII, and must be reversed to ensure consistency. Further, the *Lopez* opinion improperly narrows the scope of claims of intentional discrimination, mis-citing authority construing the ADEA.

Following *Lopez*, an individual with a disability who is excluded based upon an employer's policy targeting characteristics closely associated with the disability – for example, a hearing test (excluding a deaf person), a certificate of respiration (excluding a person with chronic obstructive pulmonary disease), or a "physical fitness" assessment (excluding a person with SCI) – will find little protection in this Circuit. Yet, Congress intended that such policies may be challenged as intentional discrimination under section 12112(a) and/or as unlawful "screen outs" under section 12112(b)(6). There is no basis for requiring these plaintiffs to demonstrate that a policy screens out so many persons with disabilities that an imbalance in work force statistics can be detected. Indeed, such particularized work and labor force statistics do not exist, and would not be probative if they did

exist.  Moreover, following *Lopez*, Congress's carefully crafted compromise balancing the needs of employers with the needs of the Nation to promote rehabilitation and to integrate individuals recovered from addictions has been upended.  Rehearing en banc or a panel rehearing is required to avoid the harmful and unnecessarily broad consequences of the divided panel's opinion.

## LEGAL ARGUMENT

**I.  A Claim Brought Under 42 U.S.C. § 12112(b)(6) Does Not Require a Statistical Showing of Collective Impact, or Other Comparative Evidence Showing That A Group of Disabled Persons Are Similarly Adversely Affected – Evidence Demonstrating That An Individual Has Been Screened Out Is Sufficient.**

Under the ADA, it is unlawful to use "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," unless the employer demonstrates that the standards, tests or criteria are "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation."  42 U.S.C. §§ 12112(b)(6), 12113(a); *see also* 42 U.S.C. §§ 12101(a)(5); 12112(b)(3)(A); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (noting that disparate impact claims are cognizable under the ADA, citing §§ 12112(b)(3)(A), (6), in discussing case limited to disparate treatment theory); *Gonzalez v. City of New Braunfels*, 176 F.3d 834, 839 (5th Cir. 1999) ("In the ADA context, a plaintiff may satisfy the second prong of his prima facie case [impact upon persons with protected characteristic] by demonstrating an adverse impact on himself rather than on an entire group.").  Further, even where the criterion is job-related and necessary, the employer must still consider whether a less onerous alternative policy would equally serve the employer's need.  *Bates*, 511 F.3d at 997 ("A reasonable accommodation may entail adopting an alternative, less discriminatory criterion," citing House Comm. on Educ. & Labor, H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 71 (1990); Senate Comm. on Labor & Human

Resources, S. Rep. No. 116, 101st Cong., 1st Sess. 37-38 (1989)).

The one-strike lifetime ban challenged here fits properly within the range of selection criteria that may be reviewed under section 12112(b)(6). *See* 29 C.F.R. § 1630.2(q) ("Qualification standards means the personal and professional attributes including the … physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired."); EEOC, Technical Assistance Manual, § 4.1 (provision "appl[ies] to all selection standards and procedures"). Nevertheless, the *Lopez* panel affirmed the dismissal of Mr. Lopez's claim.

A.   *The Plain Language of the ADA Supports Plaintiff Lopez.*

The plain language of subsection (b)(6) does not require a statistical showing of disparate impact upon a group of individuals with disabilities. Rather, the words and phrases selected – "screen out or tend to screen out" and "an individual with a disability or a class of individuals with disabilities" – confirm that a (b)(6) claim may be supported by a broad range of evidence that the challenged practice in fact functions to screen out an individual (or a class of individuals) on the basis of disability. While evidence may include statistics, it may also include the experience of the plaintiff, expert and non-expert testimony about disabilities and their effects, and even a common sense causation analysis regarding the inevitable impact of particular policies upon persons with certain types of disabilities. For example, a person with no hands is screened out by a requirement that all applicants pass an entrance exam with a fill-in-the-bubbles Scantron answer sheet; there is no need for a statistical study of the impact of the requirement upon a group of applicants without hands compared to another group with hands.

B.   *The Legislative History of the ADA Supports Plaintiff Lopez.*

Congress made clear that the prohibition on selection criteria that "screen out or tend to screen out" should be construed to protect individuals as well as

groups of individuals.  *See* H.R. Rep. No. 485(II) at 71 ("If a person with a
disability applies for a job and meets all selection criteria except one that he or she
cannot meet because of a disability, the criterion must concern an essential, non-
marginal aspect of the job, and be carefully tailored to measure the person's actual
ability to do this essential function of the job.");S. Rep. No. 116 at 37-38 (same);
*see also* Letter of Harold Russell, Chairman of the President's Committee on
Employment of the Handicapped, to The Honorable Tom Harkin (June 7, 1989)
("Thank you for the opportunity to respond to the questions addressed in your
letter of May 19th. … [T]he intent of the ADA to focus on the ability of an
individual to perform the essential functions of the job may not be well served by
the statistical group approach of the alternative language [requiring showing that
criteria disproportionately screen out persons with disabilities]. Moreover, existing
statistics on people with disabilities in the private sector labor force are inadequate
or nonexistent, making it difficult or impossible to apply such a standard."),
available at Americans With Disabilities Act Legis. History 8 (A&P) (Westlaw).

The legislative history does not suggest that individuals with disabilities
must produce a statistical showing.  Rather, Congress endorsed the reasoning of
*Stutts v. Freeman*, 694 F.2d 666 (11th Cir. 1983).  H.R. Rep. No. 485(II) at 71-72;
S. Rep. No. 116 at 38.  Mr. Stutts was an individual with dyslexia who could
perform the essential functions of the job in question, but who could not pass the
required "General Aptitude Test Battery (GATB)" because of his disability.  The
Eleventh Circuit reversed an order granting summary judgment to the employer,
finding the employer's reliance on "a test which cannot and does not accurately
reflect the abilities of a handicapped person" was contrary to the Rehabilitation
Act.  *Stutts*, 694 F.2d at 669.  No statistical analysis was required.

**C.**    ***Administrative Authorities Support Plaintiff Lopez.***

The EEOC's guidance construing section 12112(b)(6) reaffirms that

statistical evidence is not required for all claims challenging discriminatory

qualification standards:

> This standard is similar to the legal standard under Title VII of the Civil Rights Act which provides that a selection procedure which screens out a disproportionate number of persons of a particular race, sex or national origin "class" must be justified as a "business necessity."  However, under the ADA the standard may be applied to an <u>individual</u> who is screened out by a selection procedure because of disability, as well as to a class of persons.  It is not necessary to make statistical comparisons between a group of people with disabilities and people who are not disabled to show that a person with a disability is screened out by a selection standard.

> Disabilities vary so much that it is difficult, if not impossible, to make general determinations about the effect of various standards, criteria and procedures on "people with disabilities."  Often, there may be little or no statistical data to measure the impact of a procedure on any "class" of people with a particular disability compared to people without disabilities.  As with other determinations under the ADA, the exclusionary effect of a selection procedure usually must be looked at in relation to a particular individual who has particular limitations caused by a disability.

> Because of these differences, the federal <u>Uniform Guidelines on Employee Selection</u> Procedures that apply to selection procedures on the basis of race, sex, and national origin under Title VII of the Civil Rights Act and other Federal authorities <u>do not apply</u> under the ADA to selection procedures affecting people with disabilities.

Technical Assistance Manual at § 4.3(2) (emphases in original).

The Appendix to 45 C.F.R. § 84.13 – the Section 504 regulation upon which

section 12112 (b)(6) was based – similarly states that a statistical showing of

adverse impact is not required, because "the small number of handicapped persons

taking tests would make statistical showings of 'disproportionate, adverse effect'

difficult and burdensome."  45 C.F.R. pt. 84, app. A.  These regulations and the

accompanying appendix have been cited with approval by the Supreme Court.  *See*

*Bragdon v. Abbott*, 524 U.S. 624, 633 (1998); *Sch. Bd. of Nassau County, Fla. v.*

*Arline*, 480 U.S. 273, 279 & n.5 (1987) (because regulations "were drafted with the

oversight and approval of Congress," they provide "an important source of

guidance on the meaning of § 504"); *Alexander v. Choate*, 469 U.S. 287, 305

(1985).  Congress specified in the text of the ADA that it provides at least as much

protection as is provided under the Rehabilitation Act.  42 U.S.C. § 12201(a).

**D.**　　*Prior Ninth Circuit Authorities Support Plaintiff Lopez.*

Numerous courts have permitted analogous "screen out" claims to proceed without requiring statistical evidence. For example, in *Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001), the Ninth Circuit permitted a "screen out" claim on behalf of police officers with disabilities who were denied transfers under a rule requiring recent patrol service:

> There can be no question that the City's officer transfer policies are "qualification standards" that "screen out ... a class of individuals with disabilities." The policies establish minimum requirements for enabling officers to compete for specialized-assignment positions. The requirement that in order to obtain a specialized assignment, an officer must have performed patrol service the preceding year … renders officers on modified-duty status … categorically ineligible for specialized assignments …. Thus, the Officer Transfer Policy may not be applied to disabled officers unless it is "shown to be job-related and ... consistent with business necessity."

*Id*. at 889-90 (citing 42 U.S.C. § 12112(b)(6)). *Accord Robinson*, 154 F.3d at 699 ("In our view, the separate criterion of 'physical fitness' – unrelated to job requirements – as a qualification standard for promotions, layoffs and recalls tends to screen out, whether intentionally or unintentionally, disabled employees.").

In *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850 (9th Cir. 2009), the Ninth Circuit found a triable issue of fact that a respirator certification test screened out an individual with diabetes under subsection (b)(6):

> Rohr argues that the respirator certification test was itself discriminatory. … It is undisputed that the respirator certification test "screen[ed] out" Rohr due to his high blood pressure, which was a complication of his diabetes. … [B]ecause Salt River has failed to show that the respirator certification test was job-related and a business necessity, and because the test tended to screen out an individual with diabetes-related high blood pressure, Salt River has not established that it is entitled to summary judgment.

*Id*. at 862-63. No statistical evidence was submitted or required – the "screen out" was established through basic logic. *Accord Echazabal v. Chevron*, 336 F.3d 1023, 1027 (9th Cir. 2003) (permitting challenge under §§ 12112(b)(6) and 12113(a) to qualification standard related to liver function that "screened out" employee with hepatitis C without need for statistical evidence).

A series of Ninth Circuit opinions considering the impact of UPS's requirements for its package car driver positions found no difficulty appreciating that a hearing test "screens out" individuals who are deaf and hard of hearing. *See Bates*, 511 F.3d at 994 ("The district court found, and UPS does not contest, that UPS applies a qualification standard that has the effect of discriminating on the basis of disability and/or screens out the class of employees who cannot pass the DOT hearing standard. *See* 42 U.S.C. § 12112 (b)(6)."); *Morton v. U.P.S.*, 272 F.3d 1249, 1257 (9th Cir. 2001) (applying §§ 12112(b)(6) and 12113(a)), *overruled on other grounds by Bates*, 511 F.3d 974 (9th Cir. 2007); *cf. Bates v. U.P.S.*, 2004 WL 2370633 at *23 (N.D. Cal. Oct. 21, 2004) ("UPS does not deny that failure to pass the DOT hearing standard is a *per se* bar to those seeking to become package-car drivers. … [It]t is clear that UPS has a qualification standard that screens out all deaf individuals …."), *reversed and remanded on other grounds*, *Bates*, 511 F.3d 974 (9th Cir. 2007). Just as a hearing test is understood to "screen out" deaf people, so too does the lifetime ban here "screen out" individuals who are recovered from drug addiction.

E.     ***The Divided Panel in Lopez Erred By Referencing and Importing the Statistical Showing Often Presented in Title VII Cases.***

In disregarding the plain language, legislative history, and agency construction of the ADA's "screen out" provision, as well as prior Ninth Circuit authorities, the *Lopez* panel relied upon *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977), a case that considered the relevant statistical analysis to support a "pattern and practice" claim of intentional race discrimination brought under Title VII. In a "pattern and practice" race discrimination case, the prosecuting party (in *Hazelwood*, the U.S. Government) endeavors to show that race discrimination is the standard operating procedure for the employer. In this context, statistics comparing the demographics of the workforce to the labor force can be an important source of proof, as it is assumed that over time nondiscriminatory

employer policies and practices will measurably result in a generally representative workforce. *Id.* at 307-08. Such statistics are also considered in claims of "disparate impact" brought under Title VII. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 433-36 (1971).

This framework is not applicable to the claim brought here. Plaintiff Lopez is not required to introduce broad-based statistics showing a pattern and practice of disability discrimination of which he is a victim, as this is neither his theory nor experience of discrimination. Rather, Plaintiff Lopez has identified a particular eligibility criterion – the "one-strike" lifetime ban – that directly screens him out based upon his protected disability of being a person rehabilitated from drug addiction. There is no burden to present statistics encompassing the experiences of other persons with disabilities as the facts and chronology of the case establish that Plaintiff Lopez was individually "screened out" in a manner prohibited by section 12112(b)(6). The remaining inquiries include whether the rule is job related and consistent with business necessity and, if so, whether an alternative, less onerous rule could meet the employer's legitimate needs equally.

## II. The ADA Requires Close Scrutiny of Employer Policies and Practices that Penalize and Exclude Rehabilitated Drug Addicts.

After a long and careful debate, Congress explicitly articulated protections for rehabilitated drug addicts:

> (a) For purposes of this title, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

> (b) Rules of Construction – Nothing in subsection (a) shall be construed to exclude as a qualified individual with a disability an individual who . . . has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use or drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use[.]

42 U.S.C. § 12114(a)-(b)(1); *cf. Hernandez*, 362 F.3d at 568.

The Act's sponsors cited the importance of equal opportunities for individuals who have successfully recovered from addiction, as well as the nation's

interest in promoting rehabilitation:

> Treatment can save the lives of individual abusers, and it can also return them to productive roles in society which strengthens our families, our communities, our economy, and our ability to meet the competitive challenges of the growing international marketplace. By providing protections against discrimination for recovered substance abusers and those in treatment or recovery who are no longer engaged in illegal drug use, the bill provides an incentive for treatment. Under this bill, no one who seeks treatment and overcomes a drug abuse problem need fear discrimination because of past drug use.

> Retaining these protections for persons who formerly used or were addicted to illegal drugs, but who have successfully been rehabilitated and no longer use illegal drugs, is an absolutely essential component of our national war against drugs. It also helps to carry out our national commitment to encourage all those who need it to come forward for treatment, and to ensure that individuals who have successfully overcome drug problems will not face senseless or irrational barriers that work to impede their full reintegration into society.

136 Cong. Rec. H2443-H2444 (May 17, 1990) (Statement of Rep. Rangel); 135 Cong. Rec. S 10775 (Sept. 7, 1989) (Statement of Sen. Kennedy). Persons who are rehabilitated from drug addiction and seeking to rejoin society as productive members cannot do so if they are unfairly barred from opportunities based on their past drug use – the very history that renders them protected by the Act.

Close scrutiny is particularly important in the context of employer policies that exclude rehabilitated individuals, as there are many "neutral" characteristics that function as proxies for past illegal drug addiction. A rule that an employer will not hire anyone who has ever violated any drug law, who has ever possessed illegal drugs, or who has ever illegally used drugs, does not reference disability or drug addiction, but excludes 100 percent of those rehabilitated from drug addiction. Here, the effects of plaintiff Lopez's disability – his prior drug use and the prior positive on the PMA drug test – cannot be meaningfully distinguished from his rehabilitation from drug addiction. There is an inevitable equivalence between the status of being a rehabilitated drug addict and the past "conduct" of using illegal drugs. *See Arline*, 480 U.S. 273, 282 (1987) ("the contagious effects of a disease [cannot] be meaningfully distinguished from the disease's physical

effects on a claimant."); *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) ("[A]n employer cannot be permitted to use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination. … [T]he distinction between disparate treatment and disparate impact becomes fuzzy at the border, and [the plaintiff asserting disparate treatment] might conceivably be able to show that this is one of those 'proxy' situations where a case may be made for 'constructive' disparate treatment, if not actual disparate treatment."); *cf. Hazen Paper*, 507 U.S. at 613 ("Pension status may be a proxy for age [in an ADEA case] … in the sense the employer may suppose a correlation between the two factors and act accordingly."). Thus, whether framed as imposing intentional discrimination or an unnecessary "screen out," an employer policy that penalizes a rehabilitated drug addict for past illegal drug use is inconsistent with the plain language and underlying policies of sections 12112 and 12114. Such policies are permitted only where the employer can meet the standards of section 12113.

Scrutiny of the one-strike policy is further warranted because Congress granted employers all necessary discretion to protect against the effects of current illegal drug use. In addition to the generally available defenses of business necessity and direct threat, *see* 42 U.S.C. § 12113, this discretion includes:

> excluding employees and applicants who are "currently engaging in the illegal use of drugs," 42 U.S.C. § 12114(a);

> permitting employers to adopt "reasonable policies or procedures, including but not limited to drug testing, designed to ensure that [a rehabilitated drug addict] is no longer engaging in the illegal use of drugs," 42 U.S.C. § 12114(b);

> permitting employers to prohibit the use of illegal drugs in the workplace, 42 U.S.C. § 12114(c)(1), (2);

> permitting employers to "hold an employee who engages in the illegal use of drugs … to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use … of such employee," 42 U.S.C. § 12114(c)(4);

> permitting employers to require that employees comply with the Drug-Free

Workplace Act of 1988, as well as any applicable regulations or standards of the Department of Defense, the Nuclear Regulatory Commission, and the Department of Transportation, 42 U.S.C. § 12114(c)(3), (5)(A), (B); and

exempting drug testing from the Act's rules limiting medical examinations, 42 U.S.C. § 12114(d).

Here, the employer is imposing an additional exemption, one not listed in section 12114, for its one-strike rule that excluded an applicant who is rehabilitated from drug addiction on the basis of his past illegal drug use. Permitting such a policy to defeat, on summary judgment, the plaintiff's claim that the ADA has been violated is inconsistent with ADA's carefully drafted language regarding the rights of persons recovered or in recovery from drug addiction.

When an addict such as Mr. Lopez becomes successfully rehabilitated, over time his or her personal history of any positive drug test, drug-related arrest, conviction, detention, or job loss fades into the past. However, even years into a successful recovery, that same individual remains vulnerable to being screened out by employer policies, such as the one here, that automatically disqualify applicants based on such historical criteria. *See* Employers Group, Employment of Ex-Offenders: A Survey of Employers' Policies and Practices 6 (Apr. 12, 2002), at http://www.sfworks.org/docs/Employer%20survey%20report.pdf (48 percent of California employers surveyed stated that they would never hire anyone with a felony drug conviction). Persons with these disabilities must be permitted to challenge unnecessary policies that prevent them from securing employment and reintegrating into society.

## CONCLUSION

The petition for rehearing en banc should be granted.

Respectfully submitted,

April 4, 2011

| | |
|---|---|
| Claudia Center | Peter Blanck |
| The Legal Aid Society – | Burton Blatt Institute, Syracuse |
| Employment Law Center | University |

**Appendix – Statements of Interest**

The American Association of People with Disabilities (AAPD), the country's largest cross-disability membership organization, organizes the disability community to be a powerful force for change – politically, economically, and socially. Founded in 1995 on the fifth anniversary of the Americans with Disabilities Act (ADA), AAPD promotes the political, economic, and social empowerment of children and adults with disabilities in the U.S. and has a strong interest in full enforcement and implementation of the ADA to ensure equal employment opportunities for individuals with disabilities.

The American Diabetes Association is a nationwide, nonprofit, voluntary health organization founded in 1940, and has over 485,000 general members, 15,000 health professional members, and 1,000,000 volunteers. The mission of the Association is to prevent and cure diabetes and to improve the lives of all people affected by diabetes. Presently, there are 25.8 million Americans with diabetes, 26% of whom take insulin to help treat their diabetes. Centers for Disease Control & Prevention, National Diabetes Fact Sheet (2011). The Association is the largest, most prominent nongovernmental organization that deals with the treatment and impact of diabetes. The Association establishes and maintains the most authoritative and widely followed clinical practice recommendations, guidelines, and standards for the treatment of diabetes. American Diabetes Ass'n, *Clinical Practice Recommendations 2011*, 34 Diabetes Care S1 (2011). The Association publishes the most authoritative professional journals concerning diabetes research and treatment. One of the Association's principal concerns is the equitable, fair, and legal treatment of persons with diabetes in employment situations. The Association knows through long experience that employers frequently restrict employment opportunities for people with based on prejudices, stereotypes, unfounded fears, and misinformation concerning diabetes in the workplace. The

Association believes that each person with diabetes should be individually considered for employment based on the requirements of the specific job, the particular qualifications of the individual, and the capacity of that individual to fully and safely perform that job. Consistent with this policy, the Association frequently appears as *amicus curiae* in cases with the potential to affect the rights and employment opportunities of people with diabetes.

The Association on Higher Education and Disability (AHEAD) is a not-for-profit organization committed to full participation in higher education and equal access to all opportunities for persons with disabilities, including public services, professional licensing and employment, among other state activities. Its membership includes approximately 2,000 institutions including colleges, universities, and not-for-profit service providers, professionals, and college and graduate students planning to enter the field of disability practice. Many of its members are actively engaged in assuring ADA compliance and in providing reasonable accommodations to both students and employees at institutions of higher education and in high-stakes standardized testing. AHEAD publishes numerous resources on the implementation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 by post-secondary educational institutions.

The Disability Independence Group is a public interest non-profit organization whose mission is to expand opportunities for participation, education, employment and acceptance of persons with disabilities through advocacy, education, and training. Since 2002, Disability Independence Group has conducted trainings and drafted rules for governmental entities, disability service organizations, persons with disabilities and caregivers to promote accommodation and inclusion of persons with disabilities in all aspects of society.

Disability Rights Advocates (DRA) is a non-profit public interest law firm

that specializes in high impact civil rights litigation and other advocacy on behalf of persons with disabilities throughout the United States. DRA works to end discrimination in areas such as access to public accommodations, public services, employment, transportation, education, and housing. DRA's clients, staff and board of directors include people with various types of disabilities. Based in Berkeley, California, DRA strives to protect the civil rights of people with all types of disabilities. DRA has a particular interest in this case as it will affect the rights of people with disabilities to equal opportunity in employment.

The Disability Rights Education and Defense Fund, Inc. (DREDF) is a national nonprofit disability civil rights law and policy organization dedicated to protecting and advancing the civil rights of people with disabilities. Based in Berkeley, California, DREDF has remained board-and staff-led by people with disabilities since its founding in 1979. DREDF pursues its mission through education, advocacy and law reform efforts, and is nationally recognized for its expertise in the interpretation of federal disability civil rights laws.

The Disability Rights Legal Center (DRLC) is a non-profit legal organization founded in 1975 in memory of A. Milton Miller, an attorney who used a wheel chair for mobility and was one of the first advocates for disability rights in California. The DRLC is the nation's oldest cross-disability organization representing people with all types of disabilities, including those affected by cancer. The DRLC advocates, educates and litigates on behalf of people with disabilities in order to eliminate discrimination and other legal barriers that prevent the full inclusion and integration of people with disabilities in society. The DRLC is affiliated with two law schools works to further the rights, dignity, and access to justice for people with disabilities as guaranteed under state and federal anti-discrimination laws. The DRLC is a recognized expert in the field of disability rights.

The Drug Policy Alliance (DPA) is a national nonprofit organization that promotes policy alternatives to the drug war that are grounded in science, compassion, health and human rights. DPA's goal is to advance policies that reduce the harms of both drug misuse and drug prohibition, and seek solutions that promote safety while upholding the sovereignty of individuals over their own minds and bodies. For over a decade, DPA has advocated in state and federal courts, including the U.S. Supreme Court, and state and federal legislatures for the removal of barriers to employment for persons in recovery.

The Epilepsy Foundation of America leads the fight to stop seizures, find a cure and overcome the challenges created by epilepsy. A non-profit corporation founded in 1968, the Epilepsy Foundation works to advance the interests of the three million Americans with epilepsy through research, services, public information and education, and advocacy. The term "epilepsy" evokes stereotyped images and fears, which affect persons with this medical condition in all aspects of life, including, and especially, employment. Since its inception, the Epilepsy Foundation has stood against the stigma and estrangement associated with epilepsy and has supported the development of laws which protect individuals from discrimination based on these stereotypes and fears. The Epilepsy Foundation has a strong interest in the outcome of this case as the use of blanket exclusion rules to bar people with disabilities from employment is a prime example of the historic and pernicious barriers to employment that people who have had seizures face. The use of such rules should be subject to close scrutiny under the ADA, and not be allowed to trump the ADA's pre-eminent requirement that individuals be evaluated based upon their ability to do the job at hand despite the existence of a disability.

John A. Lancaster serves on the Board of Directors of the Global Universal Design Commission, Inc. (GUDC), a not-for-profit corporation established to

increase understanding and use of universal design to change the world in which we live. He served as the Executive Director of the National Council on Independent Living (NCIL), which is the oldest disability grassroots organization run by and for people with disabilities. NCIL advances the independent living philosophy and advocates for the full integration and participation of people with disabilities in society. After graduating from the University of Notre Dame in 1967, Mr. Lancaster commanded an infantry platoon in combat during the Vietnam War earning a Purple Heart and Bronze Star in 1968. Following military service, he returned to Notre Dame to for a law degree. Since 1974, he has worked as a civil rights attorney working on issues related to the integration and empowerment of people with disabilities. From 1981-1987, he served as the Director of the Office for Individuals with Disabilities for Governor Harry Hughes of Maryland. From 1991-2000, he served on the President's Committee on Employment of People with Disabilities. From 1995-2000, he served as the Committee's Executive Director and assisted the Clinton Administration in the formulation of disability employment policy.

The Judge David L. Bazelon Center for Mental Health Law is a national public interest organization founded in 1972 to advocate for the rights of people with mental disabilities. The Center engages in litigation, policy advocacy, and public education to preserve the civil rights of and promote equal opportunities for individuals with mental disabilities. Center attorneys participated in the drafting of the Americans with Disabilities Act (ADA) and the ADA Amendments Act, and have litigated significant cases under the employment nondiscrimination provisions of the ADA in the Supreme Court and lower courts.

The Legal Aid Society – Employment Law Center (LAS-ELC) is a public interest legal organization that advocates to improve the working lives of disadvantaged people. Since 1970, the LAS-ELC has represented clients in cases

covering a broad range of employment-related issues including discrimination on the basis of race, gender, age, disability, pregnancy, and national origin. The LAS-ELC has represented, and continues to represent, clients faced with discrimination on the basis on their disabilities, including those with claims brought under the Americans with Disabilities Act (ADA) and the Fair Employment and Housing Act (FEHA). The LAS-ELC has also filed amicus briefs in cases of importance to disabled persons. Further, the LAS-ELC sponsored the Prudence Kay Poppink Act, passed by the California legislature in 2000, which clarified a number of the disability discrimination provisions in California's FEHA. The LAS-ELC has particular expertise in the interpretation and application of state and federal disability nondiscrimination statutes.

The National Disability Rights Network (NDRN), is the non-profit membership association of protection and advocacy (P&A) agencies that are located in all 50 states, the District of Columbia, Puerto Rico, and the United States Territories. P&A agencies are authorized under various federal statutes to provide legal representation and related advocacy services, and to investigate abuse and neglect of individuals with disabilities in a variety of settings. The P&A System comprises the nation's largest provider of legally-based advocacy services for persons with disabilities. NDRN supports its members through the provision of training and technical assistance, legal support, and legislative advocacy, and works to create a society in which people with disabilities are afforded equality of opportunity and are able to fully participate by exercising choice and self-determination.

The National Employment Lawyers Association (NELA) is the largest professional membership organization in the country comprised of lawyers who represent workers in labor, employment and civil rights disputes. Founded in 1985, NELA advances employee rights and serves lawyers who advocate for

equality and justice in the American workplace. NELA and its 68 state and local affiliates have a membership of over 3,000 attorneys who are committed to working on behalf of those who have been illegally treated in the workplace. NELA's members litigate daily in every circuit, affording NELA a unique perspective on how the principles announced by the courts in employment cases actually play out on the ground. NELA strives to protect the rights of its members' clients, and regularly supports precedent-setting litigation affecting the rights of individuals in the workplace.

The National Federation of the Blind (NFB) is a national nonprofit membership organization with over 50,000 members, which is recognized by the public, Congress, executive agencies of government, and the courts as a collective and representative voice of blind Americans and their families. NFB promotes the general welfare of blind people by assisting them in their efforts to integrate themselves into society on terms of equality and independence, and by removing barriers and changing social attitudes, stereotypes and mistaken beliefs about blindness that result in the denial of opportunity to blind people. NFB has affiliates in all 50 states, Washington, D.C., and Puerto Rico, and over 700 local chapters. NFB has an interest in this case because the panel's decision would unduly narrow the civil rights of people with disabilities to equal opportunities in employment under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and make disability rights enforcement in the employment context more difficult for individuals with disabilities and disability community organizations.

For nearly forty years, the National Health Law Program (NHeLP ) has engaged in legal and policy analysis on behalf of low income people, people with disabilities, the elderly and children. NHeLP has provided legal representation, conducted research and policy analysis on issues affecting the health status and health access of these groups. We work to help consumers and their advocates

overcome barriers to health care, including a lack of affordable services or access to health care providers. The Program's work includes enforcement of the Americans with Disabilities Act, and our work and clients could therefore be affected by the Court's decision in this case.

The New York Branch of the International Dyslexia Association (IDA-NY) is a not-for-profit organization that provides public information, referrals, training and support to professionals, families and affected individuals regarding the impact and treatment of people with dyslexia and related learning disorders. It actively advocates for and engages in public educational efforts to promote the teaching of reading through structured multisensory, research-based instruction. Its members are actively engaged in providing special educational services, including targeted educational intervention and the provision of reasonable accommodations for students with disabilities at all levels of education and in high-stakes standardized testing. It is an active advocate in matters regarding public policy and the legal concerns of people with dyslexia and related learning disorders throughout the life span, including access to public services, public accommodations and employment.

Swords to Plowshares: Veterans Rights Organization (STP) is a community-based, not-for-profit organization that provides counseling and case management, employment and training, housing and legal assistance to veterans in the San Francisco Bay Area. Founded in 1974, STP promotes and protects the rights of veterans through advocacy, public education and partnerships with local, state and national entities. STP is a recognized veteran service organization by the U.S. Department of Veterans Affairs (VA), and has represented veterans with disabilities before the VA and military discharge review and corrections boards for over 30 years. The continuum of care it provides to veterans transitioning from military to civilian life includes residential drug and alcohol treatment programs, and job training and placement services. STP serves over 1,400 veterans a year,

nearly all of whom have one or more disabilities.  As an organization whose mission is to heal the wounds of war, to restore dignity, hope, and self-sufficiency to all veterans in need, and to significantly reduce homelessness and poverty among veterans, it has an interest in this case.  Should the Ninth Circuit panel's decision remain, the rights of people with disabilities to ensure equal opportunities in employment under the Americans with Disabilities Act would be narrowed.